# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KAREN SMITH, ex rel.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 11-2756** |
| | : | |
| **CAROLINA MEDICAL CENTER, et al.** | : | |

## M E M O R A N D U M

**STENGEL, C. J.**                                                    **August 2, 2017**

Karen Smith, the former clinical director at a mental health clinic in North Carolina, filed a qui tam complaint under the False Claims Act (FCA), 31 U.S.C. § 3729, *et seq.*, alleging that an "excluded person,"—Melchor Martinez, who had been convicted of Medicaid fraud in 2000—was improperly managing the clinic as well as several others, and that these clinics were concealing this fact, thereby rendering their Medicare and Medicaid billings fraudulent.[1] She brought her claims against three corporations that owned the clinics: Carolina Community Mental Health Centers, Inc., Northeast Community Mental Health Centers, Inc., and Lehigh Valley Community Mental Health Centers, Inc.

Several years later, the government intervened, expanding the scope of this lawsuit to include FCA claims for other improper billing practices and common law claims for unjust enrichment and fraud, and adding as defendants Martinez himself, his wife, Melissa Chlebowski, three of the clinics' administrators, Jorge Acosta, Nancy Seier, and Patricia Eroh, and two corporations formed by Martinez and Chlebowski, MM Consultants and MCM Bethlehem. Some of the defendants moved to dismiss, and the others moved for judgment on the pleadings. Now, for the reasons stated below, I will deny the defendants' motions.

---

[1] As the "relator," Karen Smith also brought a claim under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*

## I.  FACTUAL BACKGROUND

The government and relator Karen Smith allege the following:

### A.  <u>Martinez, Chlebowski, and the Clinics</u>

In the mid and late 1990s, defendant Melchor Martinez owned and operated three outpatient mental health clinics in Pennsylvania:  two clinics under the corporate ownership of Lehigh Valley Community Health Centers, Inc., and the separate Pedro Arias Melchor Martinez (PAMM) Human Resources Clinic in Philadelphia.  (Gov't Compl. ¶¶ 28, 30.)  His wife, Melissa Chlebowski, was an administrator at these clinics.  (<u>Id.</u> ¶ 38.)

In 2000, Martinez was convicted of Medicaid fraud in the Commonwealth of Pennsylvania "for billing for psychotherapy services not rendered and falsification of records" at PAMM.  (<u>Id.</u> ¶¶ 4, 28.)  (Unlike Medicare, which is administered by the federal Department of Health and Human Services (HHS), Medicaid is administered by the states and funded jointly by them and the federal government.  42 U.S.C. § 1396 *et seq*. (<u>Id.</u> ¶¶ 55–72.))  As a result, Martinez was prohibited by federal law from participating in Medicare or Medicaid for ten years, after which he could seek readmission.  42 U.S.C. S. 1320a-7(a).  (Gov't Compl. ¶¶ 90–92.)  Both HHS and the Pennsylvania Department of Public Welfare (DWP) notified him of his exclusion and its effects.  (<u>Id.</u> ¶¶ 90, 91.)

While criminal proceedings were underway against him, Martinez transferred his stock ownership of the Lehigh Valley Corporation to Chlebowski.  The couple also closed the Philadelphia clinic, PAMM, and created a new corporation, Northeast Community Mental Health Centers, Inc., which began operating a clinic that assumed the patient population and employees of PAMM.  (<u>Id.</u> ¶¶ 26, 31, 38.)

Since 2000, Martinez has continued to operate these clinics with Chlebowski despite his exclusion. They expanded the businesses, opening three other clinics under the Lehigh Valley corporation, three more under the Northeast corporation, and one clinic in North Carolina under a corporation called the Carolina Community Mental Health Centers, which the couple created in 2008. (Id. ¶¶ 6, 7, 25-27, 34, 38, 183–84; Smith Compl. ¶¶ 32, 36.) Martinez actively directed the daily operation of the clinics, led their recruitment efforts, managed staff, and profited from their billings, nearly all of which came from Medicaid and Medicare. (Id. ¶ 36; Gov't Compl. ¶¶ 95–155.) Specifically, Martinez:

- interviewed, hired, and fired staff, as well as negotiated their compensation and responsibilities, (id. ¶ 119, Ex. C; Smith Compl. ¶¶ 36, 37);

- instructed staff on how to bill for services, (Gov't Compl. ¶ 147, Ex. I; Smith Compl. ¶ 36);

- ordered staff to alter doctors' notes in patient treatment charts, (Gov't Compl. ¶ 134);

- monitored the productivity of the clinics' therapists and psychiatrists by reviewing production reports regularly provided to him, (id. ¶ 120);

- determined caseloads, schedules, and responsibilities of therapists, psychiatrists, and staff, (id. ¶¶ 132–33, 138, 146);

- trained therapists on topics including patient treatment, treatment documentation, and billing, (id. ¶ 148–49, Ex. J);

- monitored patient intake and volume, including by calling the front desk at the clinics to ask about the numbers of patients that had been

processed, receiving lists of new patients, (id. ¶¶ 144–45, Ex. F), and viewing live data feed from surveillance cameras in the clinics, (id. ¶¶ 139–40, Ex. H);

- directed the implementation of a new electronic medical records system, (id. ¶ 143, Ex. D);

- attended meetings of clinical supervisors, (id. ¶ 150, Ex. K); and

- led patient recruiting efforts, (id. ¶ 154.)

The couple hid Martinez's involvement by using Chlebowski's name on legal documents and disguising Martinez's receipt of profits as rent. The rent profits were charged by either Martinez himself or one of two corporate entities he and Chlebowski formed—MM Consultants or MCM Bethlehem Property, LLC—who owned many of the properties on which the clinics operated. (Id. ¶¶ 7–8, 36, 38, 39–44, 105, 185–90.) Martinez earned over $35,000 per month in rent from the clinics. (Id. ¶ 190.) The clinics also paid for renovations on the properties, including a $200,000 renovation to a clinic in Allentown in 2010, (id. ¶ 192), and a $700,000 improvement to a site in Bethlehem. (Id. ¶ 193.) Additionally, Martinez traveled on the companies' credit cards. (Id. ¶¶ 177, 201.)

Chlebowski certified multiple times, in 2003, 2005, 2007, 2008, 2009, and 2010 on Medicare and Medicaid clinic enrollment forms and in Medicaid provider reimbursement applications that no excluded person was an operator, director, manager, agent, consultant or owner of the clinics. (Id. ¶¶ 223–29.) She never notified Medicare or Medicaid of the involvement of an excluded person, although the clinics continued to submit claims for payment. (Id. ¶ 230; Smith Compl. ¶ 35.) And she falsely denied to Medicaid that any excluded person had an affiliation with or day-to-day involvement in the clinics. (Gov't Compl. ¶ 231.) In 2010,

Martinez falsely stated to the government in his application to HHS for reinstatement that he had not been associated with any clinic or employed at all since his exclusion.  (Id. ¶ 93, Ex. A.)  He has not been reinstated.  (Id.)

**B.  Acosta, Seier, and Eroh**

The government also brings claims against three of the clinics' other administrators:  the clinics' clinical and educational director, Jorge Acosta, the clinics' human resources director, Nancy Seier, and the clinics' billing director, Patricia Eroh.  (Id. ¶¶ 12–13.)  Acosta acted as Martinez's "right hand man" and attempted to conceal Martinez's involvement.  (Id. ¶¶ 46–48.)  Seier similarly carried out Martinez's orders, made his travel arrangements, and otherwise acted formally in his stead, knowing that he was excluded from participation.  (Id. ¶¶ 49–51.)  Eroh submitted claims to Medicaid and Medicare despite her knowledge of Martinez's exclusion, and knowing that the claims misrepresented the services provided.

**C.  Overbilling**

In addition to submitting false claims as a result of Martinez's involvement in the clinics, the defendants also allegedly submitted false claims by overbilling for services.  The clinics submitted claims to Medicaid for patient medication management visits, or "med checks," that falsely represented that the visits lasted fifteen minutes—one payable unit—when in fact they frequently lasted fewer than ten or even five minutes.  (Id. ¶¶ 242, 254, 255.)  Additionally, all the defendants except for Carolina submitted claims to Medicare and Medicaid for the services of people purporting to be therapists but who in fact had not completed the requisite master's degrees.  (Id. ¶¶ 284–94.)  Lastly, the clinics billed for services provided by auxiliary personnel as though they had been supervised by physicians when they had not been.  (Id. ¶¶ 308–13.)

On several occasions, Pennsylvania behavioral health services management companies, working on behalf of state Medicaid administrators,[2] audited the clinics and found violations. They found that psychiatrists at the Northeast and Lehigh Valley clinics had failed "to document 'clock times' in and out for several" med checks in 2009 and 2012.  (Id. ¶¶ 248, 250.)  The Pennsylvania Medicaid administrators then "recouped overpayments based on the limited sample of records reviewed."  (Id.)  Other audits in 2003, 2005, 2007, 2009, and 2013 revealed that Northeast was billing for services provided by individuals who lacked the requisite credentials to be a therapists.  (Id. ¶¶ 286, 288.)  However, the government does not allege that the Medicaid administrators recouped payments on this basis.

### D.  Procedural History

The defendants, in two groups, filed motions to dismiss: defendants Jorge Acosta, Nancy Seier, and Patricia Eroh (the "administrator defendants") filed jointly, and defendants Carolina Community Mental Health Centers, Inc., Northeast Community Mental Health Centers, Inc., Lehigh Valley Community Mental Health Centers, Inc., Melissa Chlebowski, and MCM Bethlehem Property (the "Clinic defendants") filed their own joint motion.  Defendants Melchor Martinez and MM Consultants, LLC filed an answer, then filed a motion for judgment on the pleadings and joined the other defendants' motions to dismiss.

After the conclusion of the briefing on these motions, the Supreme Court handed down Universal Health Services v. United States ex rel. Escobar, which defendants argued was

---

[2] Pennsylvania counties contract with private-sector managed care organizations ("MCOs") to manage Medicaid behavioral health services for Medicaid recipients.  (Gov't Compl. ¶ 61, 62).  These MCOs "are responsible for authorizing Medicaid payments to mental health providers and requiring providers to deliver effective and medically necessary services. They are charged with assuring that providers comply with all federal and state laws governing participation in the [Medicaid] program and all applicable DPW regulations, policy bulletins and clarifications."  (Id. ¶ 64.)  Two MCOs, Community Behavior Health and Magellan, audited the Northeast clinics.  (Id. ¶¶ 286–92).

relevant to this case.  136 S. Ct. 1996 (2016).  The parties then submitted additional briefs in light of that case.

## II.    STANDARD OF REVIEW

Typically, a complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In a qui tam action, however, the relator and the government must plead the circumstances constituting fraud with particularity, in conformity with Rule 9(b).  Fed. R. Civ. P. 9(b).  The purpose of Rule 9(b) is "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior."  Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984).

The Court of Appeals has adopted a "nuanced reading" of Rule 9(b) under which "it is sufficient for a plaintiff to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'"  Foglia v. Renal Ventures Mgmt., LLC, 754 F.3d 153, 156 (3d Cir. 2014) (quoting United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)).  Plaintiffs need not submit "'representative samples' of the alleged fraudulent conduct, specifying the time, place, and content of the acts and the identity of the actors."  Id.  However, "[d]escribing a mere opportunity for fraud will not suffice.  Sufficient facts to establish 'a plausible ground for relief' must be alleged."  Id. at 158.

A defendant may challenge the sufficiency of a complaint under Rules 8(a) or 9(b) through a motion to dismiss pursuant to Rule 12(b)(6) or a motion for judgment on the pleadings pursuant to Rule 12(c).  Turbe v. Gov't of Virgin Is., 938 F.2d 427, 428 (3d Cir. 1991).  In deciding whether relator and the government stated a claim, I may consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."  Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).  I am required to accept as true all of the factual allegations in the complaint and all reasonable inferences permitted by the factual allegations, viewing them in the light most favorable to the plaintiff.  Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007).  I am not, however, "compelled to accept unsupported conclusions and unwarranted inferences or a legal conclusion couched as a factual allegation."  Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007) (quotation marks and citations omitted).

## III.  DISCUSSION

The FCA imposes liability on any person who:

> (A)  knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B)  knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C)  conspires to commit a violation of subparagraph (A), [or] (B) . . . . [or]
>
> . . . .
>
> (G)  knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1).  The penalty for a violation is a fine between $ 5,500 and $ 11,000 and treble damages.  Id.[3] (Gov't Compl. ¶ 318.)  The North Carolina False Claims Act, under which relator brings Count II against Carolina, has the same requirements.  N.C. Gen. Stat. § 1-605 *et seq*.

The government brings claims against various groups of defendants under the FCA for four categories of conduct: A) statements in enrollment and application forms denying Martinez's involvement in the clinics; B) statements in billings for "med checks" that falsely represented that the visits had lasted fifteen minutes; C) statements in billings for services provided by individuals that falsely represented that the providers were qualified therapists; and D) statements in billings for services provided by individuals that falsely represented the individuals were supervised by therapists.[4]  The government also brings related common law claims based on the same conduct, and a claim to reverse-pierce the corporate veil against MM Consultants and MCM Bethlehem.  I hold that relator and the government have alleged sufficient facts to state their claims based on each of these categories of conduct.

### A.  FCA Liability Based on Martinez's Involvement in the Clinics (Counts I–III)

Relator and the government bring FCA claims against various defendants for false statements denying Martinez's involvement in the clinics.  (Smith Compl. Count I (FCA) and II (North Carolina FCA); Gov't Compl. Counts I–III.)  The defendants argue these claims must be dismissed.  First, with respect to all the defendants, they contend relator and the government fail to allege that any false claims were submitted that were material to the government's decision to

---

[3] The statute provides for penalties of "not less than $ 5,000 and not more than $ 10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 [Pub. L. 101-410, codified at 28 U.S.C. § 2461 Note], plus 3 times the amount of damages which the Government sustains because of the act of that person."  Id.

[4] Relator's complaint includes only the allegations described in Part A.

pay.  Second, with respect to Acosta, Seier, and Eroh, they argue the government fails to allege

with particularity their complicity in any false representations of Martinez's involvement.  I do

not find these arguments persuasive and will not dismiss these claims.

### 1.  Liability Based on False Enrollment and Application Forms

Congress enacted the FCA to protect government funds and property from fraudulent

claims.  Rainwater v. United States, 356 U.S. 590, 592 (1958).  However, "not every false

statement made to a government entity constitutes a 'false claim' under the Act."  United States

ex rel. IBEW, Local Union No. 98 v. Farfield Co., No. 09-4230, 2013 U.S. Dist. LEXIS 92590 at

*12 (E.D. Pa. July 2, 2013).  In order to state a claim under the FCA, relator and the government

must allege sufficient facts showing each defendant a) knowingly submitted false or fraudulent

claims to the government, b) the false statement was material to the government's decision to

pay, and c) the defendant acted with knowledge with respect to both the falsity and materiality of

the falsehoods.  See Escobar, 136 S. Ct. at 1996 (explaining that a defendant can be held liable

where he "knowingly violated a requirement that [he] knows is material to the Government's

payment decision").  Relator and the government have alleged sufficient facts to satisfy each

requirement with regard to false statements about Martinez's involvement in the clinics.

### a.  False Claims

Defendants argue that relator and the government have not alleged the defendants made

false or fraudulent statements about Martinez's involvement in the clinics in any claims

submitted to the government, as required for liability under the FCA.  I find, however, that they

have alleged such false or fraudulent statements in enrollment forms, and that this fraud renders

the claims subsequently submitted as a result of the enrollment false or fraudulent under the

FCA.  Because there was an amendment to the Social Security Act that relates to the government's claims, I discuss the state of the law before and after this amendment separately.

### i.  **Fraudulent Inducement Pre-2010**

For a defendant to be held liable under the FCA, he must have made a false statement in a "claim."  A "claim" is "any request or demand . . . for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded . . . ."  31 U.S.C. § 3729(b)(2).  The "claim" requirement is somewhat flexible; the Supreme Court has held that the FCA "reaches . . . all fraudulent attempts to cause the Government to pay out sums of money."  United States v. Neifert-White Co., 390 U.S. 228, 233 (1968).  Thus, although FCA liability must ultimately be premised on "at least 'a single false [or fraudulent] claim' that the defendants submitted to the Government for payment," United States ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 308 (3d Cir. 2011), courts have held that false certifications in enrollment or application forms can also create FCA liability where claims are subsequently presented pursuant to the fraudulently induced relationship with the government.  See United States ex rel. Thomas v. Siemens AG, 593 F. App'x 139, 143 (3d Cir. 2014) (holding that an individual is liable under the FCA if he submits a claim "to the government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves") (citing United States ex rel. Marcus v. Hess, 317 U.S. 537, 542–44 (1943) and United States v. Veneziale, 268 F.2d 504, 505 (3d Cir. 1959) ("[I]t has long since been settled that a fraudulently induced contract may create liability under the False Claims Act when that contract later results in payment thereunder by the government.")); see also Olson v. Fairview Health Servs. of Minn., 831 F.3d 1063, 1079 n.20 (8th Cir. 2016) (J. Riley, concurring in part) ("[W]hen a government

contract is secured through fraud, claims for payment later submitted under the contract can count as false claims even if they are not fraudulent themselves."); United States ex rel. Miller v. Weston Educ., Inc., 840 F.3d 494, 500 (8th Cir. 2016) (collecting cases); United States ex rel. Main v. Oakland City Univ., 426 F.3d 914, 916 (7th Cir. 2005) ("If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork."). This basis for liability applies not just to government contracts but also to enrollment in government programs. Id. (holding that an FCA claim could be premised on false representations in an application for eligibility for federal education subsidies); United States ex rel. Brown v. Pfizer, Inc., No. 05-6795, 2017 U.S. Dist. LEXIS 55656 at *28–30 (E.D. Pa. Apr. 11, 2017) (holding that FCA liability could be premised on misrepresented clinic trial data in an FDA approval application). Thus express false statements in enrollment documents and application forms can ground FCA liability under the theory of "fraudulent inducement."[5]

Defendants contend that a claim based on false statements in enrollment documents must rely on a theory of "implied false certification" in order to establish falsity under the FCA. Under the theory of implied false certification, when a defendant submits a claim to the government, it impliedly certifies compliance with all conditions of payment and can be held liable if it fails to disclose that "it violated regulations that affected its eligibility." Escobar, 136

---

[5] The government describes its argument as being about "express false certification" (as opposed to implied false certification), rather than emphasizing a theory of fraudulent inducement. It does, however, sufficiently make out that theory in its brief. (See Gov't Resp. Opp'n to Mots. Dismiss 26 (stating that defendants are not relying on a theory of implied false certification but on theories of misrepresentation of provider identity, factual falsity, express false certification, and fraudulent inducement); id. at 24 n.11 (citing cases, some of which relied on a fraudulent inducement theory); id. at 10 (citing 42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for the purposes of [the FCA]"), which was added to the statute in 2010, Pub. L. 111-148, § 6402(f) (Mar. 23, 2010)).

S. Ct. at 1995; Wilkins, 659 F.3d at 305. Such claims "do not say anything untrue but are misleading because of what they leave out." Olson, 83 F.3d at 1079 n.20 (J. Riley concurring in part). The Supreme Court's recent decision in Universal Health Services v. United States ex rel. Escobar clarified the standard for FCA claims that are based on implied false certifications. Defendants argue relator and the government must meet that standard here.

But claims based on false statements in enrollment or application documents—like the government and relator allege occurred here—need not rely on a theory of implied false certification. Rather, based on a theory of fraudulent inducement, a claimant can be held liable for express false certifications in enrollment documents and need not meet the standard laid out in Escobar. See Olson v. Fairview Health Servs. of Minn., 831 F.3d 1063, 1079 n.20 (8th Cir. 2016) ("Because the fraud that matters for [the relator's] theory is whatever initially induced the government to enter into the ongoing relationship, not any misrepresentations—implicit or explicit—in the claims for payment themselves, the Court's analysis [in Escobar] of when such claims can be actionably misleading is irrelevant here."); see also Escobar, 136 S. Ct. at 2001; United States ex rel. Whatley v. Eastwick Coll., 657 F. App'x 89, 94 (3d Cir. 2016); Pfizer, 2017 U.S. Dist. LEXIS 55656 at *27–28.[6]

Under the theory of fraudulent inducement, either express false statements or fraudulent omissions in enrollment documents can constitute false or fraudulent statements under the FCA. Omissions constitute false or fraudulent statements under the FCA where the claimant had a duty

---

[6] Neither of the cases the clinic defendants cite support their contention that express false certifications made on enrollment applications cannot support an FCA claim. (Clinic Defs.' Reply 4) (citing United States v. Medco Health Sys., No. 12-522 (NLH) (AMD), 2014 U.S. Dist. LEXIS 135767 at *26 (D.N.J. Sept. 25, 2014) (allowing plaintiff to proceed on an implied false certification theory and not deciding whether express false certification also applied); United States ex rel. Cooper v. Gentiva Health Servs., 2003 U.S. Dist. LEXIS 20690 at *23 (W.D. Pa. Nov. 4, 2003) (adopting a report and recommendation which found that no express certifications were made)).

to disclose the information. <u>United States ex rel. Atkinson v. Pa. Shipbuilding Co.</u>, 255 F. Supp. 2d 351, 406 (E.D. Pa. 2002) ("When a party incurs a duty to prevent a fraud on the government, its failure to fulfill that duty can give rise to liability under the False Claims Act."), <u>citing</u> <u>Luckey v. Baxter Healthcare Corp.</u>, 183 F.3d 730, 732–33 (7th Cir. 1997) (noting that where a party knowingly omits material information in presenting a "misleading half-truth" to the government, that omission may give rise to FCA liability if the government relied thereon to its financial detriment); <u>United States ex rel. Berge v. Bd. of Trustees</u>, 104 F.3d 1453, 1461 (4th Cir. 1997) ("There can . . . be liability under the False Claims Act where the defendant has an obligation to disclose omitted information.") (citation omitted). It is undisputed that, taking the allegations as true, the clinics had a duty to disclose Martinez's involvement. 42 U.S.C. §§ 1320a-7(a), 1320a-3a(a), (b); 42 C.F.R. §§ 420.204(a), 455.106(a), 1002.3(a), 1001.1001(a)(1).

Here, relator and the government have alleged sufficient facts showing that false statements or fraudulent omissions induced the government to enroll the clinics in Medcare and Medicaid. They aver Chlebowski "did not disclose Martinez's management role or exclusion" in the clinics on enrollment applications to Medicare in 2003, 2005, and 2009, even though, in enrollment forms in 2009 (to both Medicare and Medicaid), she disclosed the managing roles of other Carolina administrators. (Gov't Compl. ¶¶ 224–27.) In 2008, Chlebwoski certified in a Medicare enrollment form that "no excluded person was a manger of Lehigh Valley." (<u>Id.</u> ¶ 224.) And Chlebowski falsely denied Martinez had any involvement in or affiliation with Lehigh Valley during an audit by Magellan, a managed care organization that contracted with Pennsylvania counties to administer behavioral health services to Medicaid recipients. (<u>Id.</u> ¶¶ 62, 63, 68, 231.) In 2005, 2007, 2008, and 2010, Chlebowski certified on Medicaid reimbursement applications that no manager, consultant, agent or volunteer of the clinic had ever

been excluded or convicted of Medicaid fraud or health care fraud. (Id. ¶ 228, 229.)[7] Pursuant to the clinics' subsequent enrollment, they submitted claims for payment to Medicare and Medicaid. (Id. ¶ 58.)

Although, in addition to these allegations of express false statements, relators allege the defendants never notified Medicare or Medicaid of the involvement of an excluded person despite continuing to submit claims for payment, (id. ¶ 230; Smith Compl. ¶ 35) which might suggest an implied certification theory of liability, the other allegations of express false statements and fraudulent omissions in enrollment forms are sufficient to show falsity for the purposes of these FCA claims.

## ii. Fraudulent Inducement Post-2010

FCA liability based on fraudulent inducement with respect to health care programs is now explicit as of a 2010 amendment to the relevant portion of the Social Security Act. Patient Protection and Affordable Care Act. Pub. L. 111-148, § 6402(f) (Mar. 23, 2010), codified at 42 U.S.C. § 1320a-7b ("Criminal Penalties for Acts Involving Federal Health Care Programs"). Under this provision, an alleged claim "that includes items or services resulting from" material

---

[7] The government does not argue that false statements in Medicaid reimbursement applications are themselves false claims within the meaning of the FCA—i.e., that a reimbursement application is a "request or demand . . . for money" under 31 U.S.C. § 3729(b)(2). In fact, defendants argue that

> the Government inaccurately references 'Medicaid provider reimbursement applications.' However, Moving Defendants believe the Government is actually referring to Medicaid 'Promise Provider Enrollment Base Applications' submitted to the Pennsylvania Department of Human Services. The Government's replacing of the word 'enrollment' with 'reimbursement' is a world-class Freudian Slip . . . . These are annual enrollment applications that are not submitted in conjunction with claims for payment.

Clinic Defs.' Mot. to Dismiss 8. The Government does not dispute this in its response.

misrepresentations made "in any application for any benefit or payment under a Federal health care program" or "for use in determining rights to such benefit or payment" are "false or fraudulent for the purposes of [the FCA]." <u>Id.</u> § 1320a-7b(a)(1), (g).

With respect to any alleged misrepresentations made after the 2010 amendment, relator and the government have sufficiently alleged that the claims are false pursuant to the FCA under the 2010 amendment. This may include the allegedly false certification made on a Medicaid provider reimbursement application in 2010, (<u>id.</u> ¶ 29) and Martinez's statement in his application to HHS for reinstatement on November 30, 2010 that he had not been associated with any clinic or employed at all since his June 2000 exclusion. (<u>Id.</u> ¶ 93, Ex. A.)

### b. <u>Materiality</u>

In order to incur liability for submitting a false claim, that claim must be material to the government's decision to pay. <u>Escobar</u>, 136 S. Ct. at 2003. A false claim is material when it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Materiality "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." <u>Escobar</u>, 136 S. Ct. at 2003 (citation and internal quotation marks omitted). This standard is "demanding": it "cannot be found where noncompliance is minor or insubstantial." <u>Id.</u> This is because the FCA is "not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." <u>Id.</u> (internal quotation marks and citation omitted). Rather, only actions that "have the purpose and effect of causing the government to pay out money where it is not due, or actions [that] intentionally deprive the government of money it is lawfully owed," are actionable claims under the FCA. <u>IBEW</u>, 2013 U.S. Dist. LEXIS 92590 at *12 (internal citations omitted).

In order to show that the false certifications were material to the government's decision to accept the clinics as enrolled providers, a showing "that the Government would have the option to decline to pay if it knew of the defendant's noncompliance" in accordance with 42 U.S.C. § 1320a-7(b)(8),[8] is "not enough." Escobar, 136 S. Ct. at 2003. Rather, the allegations must show that disclosures regarding Martinez's involvement would have had an effect on the likely or actual behavior of HHS, Pennsylvania Medicaid, and the North Carolina administrators.

Stated conditions of payment in statutes or regulations are relevant in establishing materiality, though they are not "automatically dispositive." Id. "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." Id.

> Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in

---

[8] Section 1320a-7 of the U.S. Code, titled "Exclusion of certain individuals and entities from participation in Medicare and State health care programs," describes two categories: "[m]andatory exclusion," § 1320a-7(a), and "[p]ermissive exclusion." § 1320a-7(b). Excluding "[e]ntities controlled by a sanctioned individual" falls under permissive exclusion, U.S.C. § 1320a-7(b)(8).

Similarly, Pennsylvania law allows, but does not require, Medicaid to terminate providers for false statements in enrollment applications or other violations. Pennsylvania law provides that Medicaid _may_ terminate a provider and seek restitution and repayment if the provider or its agent submit false information, misrepresent the identity of the provider, enter into an agreement or conspiracy to obtain or aid another in obtaining Medicaid payment for which the provide or other person is not eligible. 55 Pa. Code §§ 1101.77 (a), 1101.75(b).

> position, that is strong evidence that the requirements are not material.

Id. at 2003–04.  The complaint must allege that the clinics did not violate one of many obscure Medicare or Medicaid regulations for which the government might excuse violation, but in fact violated a regulation for which the government would have refused to pay the clinics' claims.

This standard applies even at a motion to dismiss, at which point the government or relator must "plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality."  Id. at 2004 n.6.  Escobar itself was decided on appeal from an order granting a motion to dismiss.  Id. at 1998.

On remand from the Supreme Court's decision in Escobar, the Court of Appeals for the First Circuit had "little difficulty in concluding that [the r]elators [had] sufficiently alleged that [the defendant's] misrepresentations were material" based on three factors:  regulations making compliance a condition of payment; "the centrality of the [relevant] . . . requirements in the . . . regulatory program"; and the lack of allegations in the complaint that the government paid the claims despite knowing of the violations.  United States ex rel. Escobar v. Universal Health Servs., Inc., 842 F.3d 103, 110 (1st Cir. 2016); see also United States ex rel. Wood v. Allergan, Inc., No. 10-5645, 2017 U.S. Dist. LEXIS 50103 at *88 n.29 (S.D.N.Y., Mar. 31, 2017) (finding successful allegations of materiality where the relator "provide[d] evidence of agreements expressly designating compliance with the [relevant statute] as a condition of payment; detail[ed] alerts and guidance documents issued by the Government during the relevant time period warning against [statutory] violations; note[d] the severity of civil and criminal punishment for such violations; describe[d] the legislative history [supporting the allegations of materiality]; and

plead[ed] a kickback scheme that, taken as true, defrauded the government into paying hundreds of millions of dollars in prescription drug claims that were not eligible for reimbursement").

Here, relator and the government adequately plead the materiality of the defendants' concealment of Martinez's involvement. Each of these allegations, discussed below, helps show materiality: regulations and laws that make disclosure and compliance a condition of payment; guidance promulgated by HHS explaining its unwillingness to pay claims presented by entities controlled by excluded individuals; and letters received by Martinez explaining that his exclusion precluded involvement in the clinics. [9] In response, the defendants argue that healthcare administrators paid the claims despite knowing of the violations and that compliance is a nonmaterial condition of participation in Medicare and Medicaid, not a condition of payment of claims. I find that the defendants' arguments do not outweigh the government's showing of facts supporting an inference that the violations were material.

### i. Laws Making Compliance a Condition of Payment

First, both federal and Pennsylvania law make compliance with certain regulations regarding disclosure of interested persons an express condition of payment. Under federal law, "no payment may be made" by the relevant portion of Medicare unless the provider gives HHS

---

[9] The government also supports its argument for materiality by pointing out that it is a felony to misrepresent information about an institution in order to qualify for Medicaid or Medicare. (Gov't Resp. Opp'n to Mots. Dismiss 10); 42 U.S.C. § 1320a-7b(c). But that statute requires that the false representation be "material," and it is therefore circular to rely on that provision to show materiality here. Id. ("[W]hoever knowingly and willfully makes or causes to be made, or induces or seeks to induce the making of, any false statement or representation of a material fact with respect to the conditions or operation of any institution, facility, or entity in order that such institution, facility, or entity may qualify . . . [for a certain state programs], or with respect to information required to be provided under section 1124A [42 U.S.C. § 1320a-3a, requiring the disclosure of excluded persons who serve as managing employees or who have ownership or control interests in the provider], shall be guilty of a felony and upon conviction thereof shall be fined not more than $25,000 or imprisoned for not more than five years, or both.") (emphasis added).

"full and complete information" on the identity of any person "with an ownership or control interest in the provider" or "any managing employee of the provider." 42 U.S.C. § 1320a-3a(a); 42 C.F.R. §§ 420.204(a) (full disclosure required to the Center for Medicare and Medicaid services regarding same), 455.106(a). A "managing employee" is "an individual, including a general manager, business manager, administrator, and director, who exercises operational or managerial control over the entity, or who directly or indirectly conducts the day-to-day operations of the entity." 42 U.S.C. § 1320a-5(b).

Similarly, Pennsylvania Medicaid prohibits a terminated provider—which includes excluded individuals, see 55 Pa. Code § 1101.21—from "[r]eceiv[ing] direct or indirect payments from the Department in the form of salary, equity, dividends, shared fees, contracts, kickbacks or rebates from or through a participating provider or related entity." Id. § 1101.77(c)(2)(ii). [10]

## ii. Administrative Guidance

Second, relator and the government identify statutes and regulations making it a condition of payment that no excluded person have "furnished" items or services for which the provider claims payment. 42 U.S.C. §§ 1395y(e)(1), 1320a-3a(a), (b); 42 CFR § 1001.1901(b). [11] Defendants concede that materiality is established if Martinez furnished items or services, (Clinic Defs.' Supp. Mem. Support. Mot. to Dismiss 4; Martinez Defs.' Mot. J. Pleadings 11),

---

[10] North Carolina's laws governing disclosure and recoupment are more general. See, e.g., N.C. Gen. Stat. § 108A-63(a), (b) (making it unlawful for a provider to knowingly make false statements or representations of material fact in any application for payment or with respect to conditions or operations of a provider in order to qualify or remain qualified to provide Medicaid; unlawful for provider to knowingly and willfully conceal or fail to disclose any fact or event affecting his initial or continued entitlement to Medicaid payment); N.C. Gen. Stat. § 22F.0601(a) (authorizing the North Carolina Medicaid program to recoup improper payments).

[11] Pennsylvania law similarly "does not pay for services or items rendered, prescribed or ordered" by providers who have been terminated from the program. 55 Pa. Code §§ 1101.77(c)(1), 1101.66(e).

but argue that Martinez's activities, as alleged in the complaint—which involve acting as a landlord and business administration and development—do not constitute furnishing services. (Id.)  However, HHS declared in administrative guidance documents its intention to consider Martinez's conduct to be "furnishing services."  This guidance shows that HHS would likely have denied payment had the clinics' truthfully disclosed Martinez's participation, and therefore supports a finding of materiality.

In 1999, HHS promulgated a Special Advisory Bulletin interpreting the meaning of "furnish" in the statute and regulations.  The bulletin explained that the agency considered providing administrative and management services to be "furnishing" services under the statute. (Gov't Compl. ¶¶ 75–78) (citing HHS Special Advisory Bulletin, "The Effect of Exclusion from Participation in Federal Health Care Programs," (Sept. 1999)).  It stated,

> 76.  "The prohibition against Federal program payment for items or services furnished by excluded individuals or entities also extends to payment for administrative and management services not directly related to patient care, but that are a necessary component of providing items and services to Federal program beneficiaries."  Id.
>
> 77. "In addition, no Federal program payment may be made to cover an excluded individual's salary, expenses or fringe benefits, regardless of whether they provide direct patient care."  Id.
>
> 78. "[T]he practical effect of an OIG exclusion is to preclude employment of an excluded individual in any capacity by a health care provider that receives reimbursement, indirectly or directly, from any Federal health care program."  Id.

Id. (footnote referencing an updated 2013 version of the bulletin omitted).[12]

---

[12] The bulletin also affects payments by Pennsylvania and North Carolina because the federal government reimburses a large portion of state Medicaid expenses. (Gov't Compl. ¶ 59) (explaining that the federal government funded between fifty-four and sixty-six percent of Medicaid costs during the relevant years in Pennsylvania and North Carolina).  Medicare is a federal program.  (Id. ¶¶ 55–58.)

The Clinic defendants argue that the HHS bulletin's interpretation, which is not binding on this court but only relevant to the extent it has the "power to persuade," Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000), employs an overly broad interpretation of what it means to "furnish" services. (Clinic Defs.' Mot. to Dismiss 10).[13] But regardless of what it means to

---

[13] The Clinic defendants point out that the Social Security Act addresses excluding "entities controlled by a sanctioned individual" at 42 U.S.C. § 1320a-7(b)(8), and makes their exclusion permissible but not mandatory. By contrast, the Act addresses paying claims for items or services furnished by an excluded entity or individual at 42 U.S.C. § 1395y(e)(1), and prohibits payment absolutely. Id. ("No payment may be made . . . with respect to any item or service . . . furnished . . . (A) by an individual or entity during the period when such individual or entity is excluded.") The Clinic defendants argue that the differential treatment of "entities controlled by a sanctioned individual"—which may be excluded—and entities submitting claims for services "furnished" by an excluded individual—which cannot be paid, shows that an excluded individual's management of a provider does not constitute "furnishing" services. (Clinic Defs.' Supp. Mem. Support. Mot. to Dismiss 4) ("[T]he Government treats services 'furnished' by an excluded provider much differently than services provided by an entity that is owned or controlled by an excluded [individual]."). In other words, because the Act treats these categories of claims differently, they argue, "furnishing services" cannot also mean controlling an entity that provides services.

The government reads the statute differently. It presents two arguments: first, that a broad interpretation of what it means to "furnish services" is consistent with the statute's language, which precludes payment

with respect to any item or service . . . furnished –

(A) by an individual or entity during the period when such individual or entity is excluded . . . ; or

(B) at the medical direction or on the prescription of a physician during the period when he is excluded . . . .

42 U.S.C. § 1395y(e)(1). As the government argues, the statute's description of these two categories suggests that conduct falling under Part A includes conduct other than the direct provision of medical services—i.e., healthcare administration. (Gov't Resp. Opp'n to Mots. to Dismiss 16.)

Second, the government argues that HHS's interpretation in the bulletin of what it means to "furnish" services is consistent with the overarching Medicare scheme established by federal law under the Social Security Act, which excludes individuals for misconduct related to the business and administration of healthcare. (Gov't Resp. Opp'n to Mots. Dismiss 17.) See 42 U.S.C. § 1320a-7(a)(3), (b) (requiring exclusion for fraud, embezzlement, breach of fiduciary responsibility, and financial misconduct, and allowing exclusion for obstruction of an investigation or audit, excessive billing, paying kickbacks, or failure to disclose required

furnish services, HHS was statutorily authorized to exclude entities controlled by an excluded

person under 42 U.S.C. § 1320a-7(b)(8). See also 42 C.F.R. § 420.204(b) (authorizing HHS to

"refuse to enter into or renew an agreement with a provider of services, or to issue or reissue a

billing number . . . if any person who has an ownership or control interest in the provider or

supplier, or who is an agent or managing employee, has been convicted of a criminal offense or

subjected to any civil penalty or sanction related to the involvement of that person in Medicare

[or] Medicaid."). The bulletin shows that HHS took seriously the involvement of excluded

individuals in healthcare providers. Regardless of whether it would have responded by refusing

payment, as suggested by the bulletin, or by excluding the clinics altogether, as permitted under

§ 1320a-7, the result would be the nonpayment of the clinics' claims. Therefore the bulletin

helps the government show materiality.

### iii. **The Letters**

Third, the government provides support for materiality by alleging that the information

about Martinez's involvement was material to the government's decision to pay, and Martinez

knew this, because healthcare administrators told him as much in letters sent to him describing

the conditions of his exclusion after his 2000 conviction. The Pennsylvania Department of

Public Welfare (DWP) notified him that

> no payments will be made to you by the Program for services
> rendered by you or by anyone under your supervision . . . .
> Further, the Department will not pay for any services arranged,
> rendered, supervised, prescribed or ordered by you for any other
> provider or from any other provider, nor will the Department make
> payments for services through which you may receive indirect
> payments by any means, including ownership, salary, shared fees
> or contracts.

---

information). It argues that it comports with this provision to read the statute on exclusion to
allow HHS to refuse to pay the claims of entities whose administration is partly being run by
such excluded individuals.

(Gov't Compl. ¶ 90.)  HHS further informed him that

> no program payment will be made to you for anything that you do .
> . . or to any employer for anything that you do, order, or prescribe
> to program patients . . . . Any service you provide is a non-covered
> service.  Therefore, you cannot submit claims or cause claims to be
> submitted for payments under any Federal health care program.

(Id. at ¶ 91.)  These letters also support a finding that both Pennsylvania's Medicaid

administrators and HHS would have refused to pay the clinics' claims had they known of

Martinez's involvement.

### iv.  Government Knowledge

Defendants argue that the government's knowledge of Martinez's involvement in the

clinics as a result of Smith's qui tam complaint and continued payment in spite of that

knowledge shows on the face of the complaint that information about his involvement was

immaterial.  (See Clinic Defs.' Mot. to Dismiss 11; Clinic Defs.' Supp. Mem. Supporting Mot. to

Dismiss 5).  They point out that while Smith filed her qui tam complaint in 2011, the government

continued to pay the clinics' Medicaid claims until 2015 and are still paying the clinics'

Medicare payments.  (Clinic Defs.' Supp. Mem. Supporting Mot. to Dismiss 5 n.2) (referencing

a related case in which the clinics' requested an injunction instructing a Medicaid administrator

to make future Medicaid payments to the clinics, which I denied. See Lehigh Valley Community

Mental Health Centers, Inc. v. Pa. Dep't of Human Servs., No. 15-4315, 2015 U.S. Dist. LEXIS

144717 (E.D. Pa. Oct. 26, 2015)).  However, I find that the complaint does not show that the

government knew of Martinez's involvement as a result of the qui tam complaint, and therefore

this does not outweigh other allegations supporting materiality.

Prior to Escobar, several courts refused to consider the government knowledge defense

on a motion to dismiss.  See United States v. Bollinger Shipyards, Inc., 775 F.3d 255, 264 (5th

Cir. 2014) ("The government knowledge defense is not appropriate at the motion to dismiss stage, which requires [the court] to draw all inferences in favor of the United States."); accord U.S. ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991). Escobar, however, explains that the government knowledge defense should be considered at this stage. 136 S. Ct. at 2004 n.6. In reviewing a district court's grant of a motion to dismiss, the Supreme Court in Escobar explained that "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material," and, in a footnote immediately following this statement, further elaborated that the Court

> reject[ed] [the defendant's] assertion that materiality is too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss or at summary judgment. The standard for materiality that we have outlined is a familiar and rigorous one. And False Claims Act plaintiffs must also plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality.

Id. at 2004 n.6.

Escobar did not, however, alter the fundamental procedural rule that "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997). Moreover, as the Court of Appeals for the First Circuit interpreted the Supreme Court's holding in Escobar, "mere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance," and even actual knowledge that certain requirements were violated "is not dispositive." 842 F.3d at 110–12; see also Pfizer, 2017 U.S. Dist. LEXIS 55656, at *33–34 (holding that, on a motion to dismiss, the United States had successfully pleaded an FCA claim because it alleged that it was unaware of the false or fraudulent nature of the defendant's

statements in spite of the relator's allegations, and so continued to pay the claims); but see D'Agostino v. ev3, Inc., 845 F.3d 1, 8–9 (1st Cir. 2016) (mentioning that the fact that the Center for Medicare and Medicaid "has not denied reimbursement for [the drug] in the wake of [the relator's] allegations casts serious doubt on the materiality of the fraudulent representations that [the relator] alleges" but continuing that, "[i]n any event" the real issue with his complaint was a failure to plead causation).[14]

Here, defendants rely on allegations outside the complaints and ask me to draw inferences against the government. The complaint does not allege that the government knew, after 2011, that defendants had made false certifications as a result of the allegations in the Smith complaint; and the complaint does not allege that Medicare payments continued after the filing of the government's complaint in 2015. As I must at this stage take all allegations in the complaints as true and draw all inferences in the government's favor, Foglia, 754 F.3d at 157, I do not find that this negates the other allegations showing materiality.

### v. Conditions of Participation

The defendants also argue that compliance with the disclosure requirements and Martinez's exclusion was a condition of participation in the Medicare and Medicaid programs, not a condition of payment, and therefore not material to the healthcare administrators' decision to pay under United States ex rel. Wilkins v. United Health Group. 659 F.3d at 309. (Clinic

---

[14] As defendants have not challenged the complaint's allegations of causation, I do not address the D'Agostino court's emphasis on government knowledge and nonaction with respect to that element. See id. at 7–9 (holding that the FDA's decision never to recall or relabel the drug that it allegedly knew resulted from a fraudulent approval application left a "fatal gap" in the complaint). The materiality inquiry is distinct from the causation inquiry. United States ex rel. Petratos v. Genentech Inc., 855 F.3d 481, 492 (3d Cir. 2017) ("[E]vidence of how the claim makes its way to the government should be considered under the causation analysis, while the materiality analysis begins after a claim has been submitted. The materiality inquiry, in asking whether the government's payment decision is affected, assumes that the claim has in fact reached the government.").

Defs.' Mot. to Dismiss 7–12). But, unlike in <u>Wilkins</u>, the defendants here do not identify an

administrative scheme for managing and correcting violations over time. <u>Id.</u> They therefore do

not undermine the government's showing of materiality.

 "Conditions of participation" is a term of art that describes requirements that "are

enforced through administrative mechanisms" where "the ultimate sanction for violation of such

conditions is removal from the government program, while conditions of payment are those

which, if the government knew they were not being followed, might cause it to actually refuse

payment." <u>Id.</u> at 310–11 (quoting <u>United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.</u>,

543 F.3d 1211, 1220 (10th Cir. 2008)) (quotation marks and alterations omitted). The purpose of

this limitation is to prevent courts from using the FCA to enforce regulatory provisions that the

regulatory agencies themselves have chosen either not enforce or to enforce more delicately. <u>Id.</u>

Courts are concerned that "permitting *qui tam* plaintiffs to file suit based on the violation of

regulations which may be corrected through an administrative process and which are not related

directly to the Government's payment of a claim" would "shift the burden of enforcing the

Medicare regulations" to the courts "even though the administration of the vast and complicated

Medicare program is best left to the administrators." <u>Id.</u>; <u>U.S. ex rel. Freedom Unlimited Inc. v.</u>

<u>City of Pittsburgh</u>, No. 12-1600, 2016 U.S. Dist. LEXIS 43701 at *93–94 (W.D. Pa. Mar. 31,

2016).

Thus, a finding that a requirement is a condition of participation undermines materiality

when violating that requirement would lead the regulatory agency to initiate corrective measures

other than declining payment. <u>Wilkins</u>, 659 F.3d at 309. In <u>Wilkins</u>, the relator alleged that a

health center was liable under the FCA for submitting claims for payment while it was violating

marketing regulations. <u>Id.</u> at 300. In finding that these regulations were not conditions of

payment, but rather of participation, the Court of Appeals explained that the relevant regulation "provides that before CMS may issue a notice of intent to terminate a Medicare contract it will provide a plan sponsor 'a reasonable opportunity of at least 30 calendar days to develop and implement a corrective action plan to correct the deficiencies'" and also had several exceptions to allow for a longer period of time. Id. at 309. These regulations "clearly demonstrate that compliance . . . is a condition of participation and not a condition of payment as the regulations draw a line between the type of violations which are correctible and, if corrected, will allow the sponsor to continue as a Medicare program participant and the type of violations which lead to immediate termination of a CMS contract." Id.

Here, the Clinic defendants do not identify a scheme under which HHS would initiate corrective measures other than declining payment if they had known of Martinez's involvement. Rather, they merely point out that: 1) the forms on which the false statements were made are enrollment forms, not claims for payment, and 2) the Social Security Act gives HHS discretion to exclude entities from participation, but does not make such exclusion mandatory. 42 U.S.C. § 1320a-7. (Clinic Defs.' Mot. to Dismiss 9.) Neither of these facts shows that a regulatory scheme existed with respect to the involvement of excluded individuals that allowed providers to come into compliance over a period of time, rather than either being immediately excluded or immediately denied payment for their claims. Therefore, this argument also fails to undermine the government's allegations supporting materiality.

Because the government has alleged sufficient facts to support an inference that the government would actually have denied payment to the clinics had it known of Martinez's involvement, it has sufficiently alleged facts supporting materiality.

    **c.**   **<u>Scienter</u>**

Finally, in order to establish FCA liability with regard to Martinez's involvement in the clinics, relator and the government will have to prove that defendants "knowingly violated a requirement that the defendant[s knew was] material to the Government's payment decision." Escobar, 136 S. Ct. at 1996; see also 31 U.S.C. § 3729(a)(1), (b)(1)(A). In the wake of Escobar, defendants argue that the government and relator fail to allege facts showing scienter. (Martinez Defs.' Letter Support Mot. to Dismiss and J. on the Pleadings after Escobar 5). But knowledge "may be alleged generally" under Rule 9(b). Fed. R. Civ. P. 9(b). The complaints describe the requisite scienter with general allegations respecting each noncorporate defendant. (See Gov't Compl. ¶¶ 98, 99, 202–10, 222, 301, 303, 354.) Moreover, allegations of Martinez's receipt of two letters describing the restrictions as a result of his exclusion bolster the allegations of knowledge.

Therefore, because the government and relator have alleged false claims, materiality, and the requisite knowledge, they have stated a claim under the FCA and NCFCA based on the clinics' false certifications regarding Martinez's involvement.

## 2.  Particularity Respecting Acosta, Seier, and Eroh

The government alleges that three of the clinics' administrators—Jorge Acosta, Nancy Seier, and Patricia Eroh—are also liable under the FCA. These defendants move separately to dismiss the claims against them, arguing that the government does not plead fraud with particularity as required by Rule 9(b). They contend the government does not "offer any dates, state any names of patients whose application for benefits were submitted to Medicare or Medicaid, or support any allegations with evidence to show that the defendants Acosta, Seier or Eroh did anything wrong." (Admin. Defs.' Mot. to Dismiss 11).

With respect to its FCA claims against each defendant, the government must allege that the defendant 1) submitted, caused to be submitted, or conspired to submit a false or fraudulent claim or record or statement material to such claim, 2) materiality, and 3) scienter. <u>Escobar</u>, 136 S. Ct. at 1996. Materiality and scienter, which the administrator-defendants do not challenge, are sufficiently pled: as discussed above, materiality has been alleged by showing that, had the clinics' disclosed Martinez's involvement, their claims would not have been paid. Scienter has been alleged by the complaint's statements that each of the three administrators knew that Martinez "was not allowed to have a role in the clinics," (Gov't Compl. ¶¶ 46, 49, 53), and that the clinics received over $74 million from Medicare and Medicaid between 2009 and 2012— over 99% of their business—from which one could infer that the clinics' administrators knew claims were being submitted to the government for payment. (<u>Id.</u> ¶ 105.) The issue with respect to the administrator-defendants is whether they submitted or caused to be submitted false or fraudulent claims to the government. I find that the government's allegations show sufficient involvement in a scheme to submit fraudulent claims to the government.

Individuals who do not themselves submit claims can be held liable "on the theory that they caused the presentation of false claims where they had agreed to take certain critical actions in furtherance of the fraud," even where they are not the fraud's "prime mover." <u>United States ex rel. Tran v. Comput. Scis. Corp.</u>, 53 F. Supp. 3d 104, 127 (D.D.C. 2014) (citing <u>U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah</u>, 472 F.3d 702, 715 (10th Cir. 2006)). However, liability under a causation theory "requir[es] more than mere passive acquiescence." <u>Sikkenga</u>, 472 F.3d at 714–15. "[I]n examining whether a non-submitting party has 'caused' the submission of a false claim or false statement, a court must look at the degree to which that party was involved in the scheme that results in the actual submission." <u>Tran</u>, 53 F. Supp. 3d at 127;

see also United States ex rel. Polansky v. Exec Health Res., Inc., 196 F. Supp. 3d 477, 513 (E.D. Pa. 2016) (holding that some level of direct involvement is necessary for direct liability under the FCA); United States v. President & Fellows of Harvard Coll., 323 F. Supp. 2d 151, 187 (D. Mass. 2004) ("Where a defendant has an ongoing business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant or disclose the false claims to the United States, the defendant's ostrich-like behavior itself becomes a course of conduct that allowed fraudulent claims to be presented to the government.") (internal quotation marks and citations omitted).

With respect to each of the defendants, the government alleges that they were sufficiently involved in the scheme that resulted in the submission of false claims to support a finding that they caused the claims to be submitted, as follows.

### a. **Acosta**

The Government alleges Acosta began working for the clinics in 2007 and "acted as Martinez's 'right hand man.'" (Id. ¶¶ 46, 47.) He "took his orders from Martinez and eschewed the authority of the clinics' medical director, who was supposed to be above him in the chain of command." (Id.) He witnessed Martinez's involvement in the clinics: he accompanied Martinez to the Carolina clinic, where Martinez "took over a meeting of therapists" being run by the clinic's director. (Id. ¶ 198.)

He also assisted in Martinez's therapist recruiting efforts, organizing "a large recruiting fair at a Santo Domingo hotel where Martinez made a presentation about the PA clinics to approximately 600 candidates for therapist jobs in the PA clinics" "in or around" 2008. (Id. at ¶ 165.) "Acosta screened the candidates' resumes and presented a report for Martinez's review." (Id. ¶¶ 166.) As a result of these efforts, "several groups of people from the Dominican

Republic" were hired by the clinics.  (Id. ¶ 167.)  In total, the clinics hired 150 over 150 new

therapists during Martinez's exclusion.  (Id. ¶ 159.)

Acosta taught courses in the 2008–2010 masters' degree program that Martinez had

coordinated.  (Id. ¶¶ 173–74.)  He was on a team that was "responsible for collecting documents

from various Dominican institutions pertaining to individual Lehigh Valley and Northeast

therapists."  (Id. ¶ 178.)  He helped Martinez and Chlebowski enforce their requirement that all

therapists working in the Pennsylvania clinics participate in the masters' program.  (Id. ¶ 179.)

Finally, he "intimidated or attempted to intimidate clinic colleagues to achieve Martinez's ends."

(Id. ¶ 47.)  He "sought to conceal Martinez's involvement in the clinics from the government,

thereby perpetuating the clinics' fraud upon Medicare and Medicaid."  (Id. ¶¶ 47, 48.)

These allegations sufficiently describe Acosta's involvement in the fraudulent scheme to

involve Martinez in the clinics despite his exclusion, thereby causing false or fraudulent

Medicaid and Medicare claims to be submitted.

### b.  **Seier**

The government alleges Seier, the clinics' human resources director, worked closely with

Martinez and kept him informed about the clinics' business.  It alleges she worked with Martinez

to "hire[] an outside IT consultant to design a program to regularly email to Martinez a report

detailing the patient count and patient demographic information for all of the PA clinic sites."

(Id. ¶ 145, Exhs. G and H.)  She also "presented Martinez with the results of a staff evaluation to

assist Martinez in determining who he should consider for a new position in quality assurance"

in May 2011. (Id. ¶ 153, Ex. L.)  Seier was on the team with Acosta that was "responsible for

collecting documents from various Dominican institutions pertaining to individual Lehigh Valley

and Northeast therapists."  (Id. ¶ 178.)

Finally, "[s]tarting in or around 2008, Seier was in charge of maintaining the clinics' credentialing files."  (Id. ¶ 290 n.14.)  The documentation in Northeast's files, presented to CBH as part of an audit, "obscured the educational and work history of several Northeast therapists" and Northeast "materially misrepresented to CBH the date of hire of many therapists" to conceal that they had been working prior to obtaining the requisite degrees.  (Id. at ¶¶ 290–93.)  Like Acosta, Seier also "assisted in Martinez's and Chlebowski's efforts to keep clinic employees from revealing the fraudulent scheme to authorities," and "made multiple false and misleading statements denying Martinez's involvement in the clinics in depositions conducted in this matter."  (Id. ¶¶ 217, 219.)

These allegations sufficiently depict Seier's involvement in the clinics' scheme to submit fraudulent claims to Medicare and Medicaid.  Not only did Seier work closely with Martinez, she made false records that were material to claims submitted for payment.  This states a claim under the FCA.

### c.  Eroh

Plaintiffs also state a claim against defendant Eroh under the FCA for presenting false claims to the government or conspiring to present false claims.  Eroh, who is Chlebwoski's mother, has been the clinics' billing director since 2001.  (Id. ¶ 52.)  She submitted or supervised the submission of all claims for payment to Medicare and Medicaid for all of the clinics after 2001, despite knowing that Martinez was wrongfully operating the clinics.  (Id. at ¶¶ 12, 52–54, 209, 220–21, Exs. K, I.)  As the government has successfully pled that these claims for payment were false under the fraudulent inducement theory, plaintiffs have stated a claim against Eroh on these grounds.

Therefore, I will deny the defendants' motions with respect to the administrator-defendants.

### B. "Med Checks" Too Short To Be Payable (Counts IV and V)

Defendants argue the government's claim against Martinez, Chlebowski, Eroh, Northeast, and Lehigh Valley for fraudulently billing for patient "medication management visits," or "med checks," fails to plead fraud with the requisite particularity because it does not provide any legal support for the alleged requirement that med check visits last at least fifteen minutes and that the clinics were required to document visits' start and end times. (Clinic Defs.' Mot. to Dismiss 12–13.) This argument goes to the government's failure to plead the materiality of the false billings. However, because the government alleges the Pennsylvania Medicaid administrators recouped overpayments as a result of the clinics' failures to document start and end times for the visits, it has sufficiently alleged facts showing materiality.

Under Escobar, proof of materiality is broader than the mere existence or nonexistence of a regulation, and can include "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with a particular statutory, regulatory, or contractual requirement." 136 S. Ct. at 2003; cf. United States ex rel. Schimelpfenig v. Dr. Reddy's Labs. Ltd., No. 11-4607, 2017 U.S. Dist. LEXIS 44064 at *23 (E.D. Pa. Mar. 27, 2017) (finding that plaintiffs had not pled materiality where they did not identify legal requirements that had been violated or instances in which the government refused payment of a claim or initiated an action to recoup payment on the basis of noncompliance).

Although the government's complaint does not cite support for its assertions that the Pennsylvania Medicaid administrators "do not pay for a med check that is not a minimum of 15 minutes," (id. ¶ 240), and that they "do not pay for med checks not supported by documentation

of patient time in and time out in the patient's chart," (id. ¶ 247), the government nonetheless establishes materiality with other allegations. First, the Pennsylvania Code prohibits providers from submitting a claim that "misrepresents the description of the services . . . provided." 55 Pa. Code. § 1101.75(a)(8). And, second, the government alleges that, in 2009 and 2012, a Pennsylvania Medicaid administrator assessed an overpayment when it found that the Lehigh Valley clinics were not documenting start and end times. (Gov't Compl. ¶¶ 248, 250.) A healthcare administrator met with Chlebowski in 2011 and again in 2012 "to discuss adding start and end times to patients' charge notes for medication management; however, Chlebowski did not implement the requirement." (Id. ¶¶ 249, 250.) These allegations are sufficient to support an inference that the government refuses to pay claims in the mine run of cases when it knows the provider did not meet the fifteen-minute minimum or document clock times.

### C.  Unqualified Therapists (Count VI)

The government alleges that all defendants except for Carolina violated the FCA by submitting claims to Medicaid and Medicare for the services of people purporting to be therapists but who in fact had not completed the requisite master's degrees. (Gov't Compl. ¶¶ 284–94.) Defendants argue that the complaint fails to show materiality because it alleges that a Pennsylvania healthcare administrator was aware of at least some of these violations, but does not allege that it refused to pay claims for these services or pursued recoupment or FCA claims against the clinics. However, I hold that, while materiality is vitiated where the government pays current claims it knows to be fraudulent, it is not defeated on a motion to dismiss by the suggestion in the complaint that healthcare administrators did not seek redress for past improper billings.

Under Escobar, the government's payment of claims "despite its actual knowledge that certain requirements were violated" is "very strong evidence" that the requirements are not material. 136 S. Ct. at 2003–04. Thus the government knowledge argument against materiality requires both actual knowledge that claims are fraudulent and actual payment of these claims despite this knowledge. Id. Actual knowledge is different from a strong suspicion that the claims were fraudulent. Escobar, 842 F.3d at 110–12; U.S v. Pub. Warehousing Co., No. 1:05-CV-2968-TWT, 2017 U.S. Dist. LEXIS 37643, at *18 (N.D. Ga. Mar. 16, 2017). And actual payment of the claims despite this knowledge requires that the knowledge and the payment occur contemporaneously; a decision not to recoup payment or file an FCA claim based on past false claims is not the same as a decision to pay a claim.

However, courts must bear in mind that the FCA is not meant to provide a remedy for violations that the regulatory agency itself would not enforce. Wilkins, 659 F.3d at 310–11. While the government's decision not to recoup overpayments or pursue an FCA claim may not be "very strong evidence" of a lack of materiality, it still provides some evidence. See D'Agostino, 845 F.3d at 8–9 (mentioning that the fact that the Center for Medicare and Medicaid "has not denied reimbursement for [the drug] in the wake of [the relator's] allegations casts serious doubt on the materiality of the" alleged violations).

Although the government alleges that Pennsylvania healthcare administrators were aware of past violations of the requirement that therapists meet certain qualifications, this is not sufficiently strong evidence against materiality to require dismissal. The government's allegations of the healthcare administrators' knowledge are all with respect to knowledge acquired in audits of past billings: the auditors allegedly discovered that the clinics were billing for unqualified therapists in 2003, 2005, 2007, 2009 and 2013. (Gov't Compl. ¶¶ 286, 288.)

Although the government does not allege that the Pennsylvania healthcare administrators sought to recoup these payments, even though it alleges it did so for violations of other requirements, see id. ¶¶ 248, 250, a decision not to recoup payment or pursue an FCA claim is not equivalent to a decision to pay a claim despite knowing of the violation. Therefore, to the extent this argument undermines the government's showing of materiality, it does not persuade me that the government has failed to state a claim.

### D. **Unsupervised Therapy (Count VII)**

The defendants argue that the government's allegations with respect to its FCA claim against Martinez, Chlebowski, Eroh, Northeast, and Lehigh Valley for submitting claims for auxiliary personnel who were not adequately supervised by a physician do not contain adequate facts. (Clinic Defs.' Mot. to Dismiss at 17.) Under Rule 9(b), "it is sufficient for a plaintiff to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." Foglia, 754 F.3d at 156. Here, the government has done so by citing specific dates and the numbers of claims billed as well as the number of physicians on-site for several clinics during this time.

The government provides examples of dates on which there were insufficient physicians on-site to supervise the number of auxiliary personnel for whom the clinics billed: "[f]or example, for dates of service May 25, May 31, and June 23, 2012, Lehigh Valley submitted 95 claims to Medicare for psychotherapy (code 90806) under the NPI numbers of seven of Lehigh Valley's psychiatrists" even though "[t]wenty-four out of the 95 paid claims were for therapy sessions conducted by auxiliary personnel when no psychiatrist was present at the clinic site to supervise." (Gov't Compl. ¶¶ 308–11.) "Similarly, in Northeast, on Tuesdays in 2011 and 2012 . . . there were only two physicians—one of whom was half day only—to supervise auxiliary

personnel seeing Medicare patients at the four Northeast clinic sites." (Id. ¶ 312.) On these occasions, Medicare paid claims "as if the physician had himself performed the service." (Id. ¶¶ 309, 313.) Eroh submitted or supervised the submission of these claims despite knowing that they described impossible circumstances. (Id. ¶¶ 260, 303, 304.) These allegations are sufficient to support a strong inference that that the clinics were improperly billing.[15]

### E. Common Law Claims (Counts IX, X, and XI)

The government also brings three common law claims for payment by mistake of fact (count nine), unjust enrichment (count ten) and common law fraud (count eleven).[16] The defendants argue that the complaint's failure to identify under which state's law it is proceeding requires dismissal of these claims. However, all the alleged events in the complaints took place in either Pennsylvania or North Carolina, and defendants have not described differences in those states' laws with respect to these claims that would prevent defendants from being put on notice of the claims against them. Therefore, this omission does not mandate dismissal of the claims.

I conclude that the government has stated a claim under these three common law theories for the same reasons that it has stated a claim under the FCA.

### 1. Mistake of Fact and Unjust Enrichment

Under general principles of restitution, where a person "makes a payment by mistake to a person not entitled to receive the funds, [he] is entitled to a return of these funds to avoid unjust enrichment, unless the recipient of the funds has changed his position to his detriment in reliance

---

[15] The defendants do not make a separate argument regarding the government's count eight, which alleges the Martinez, Chlebowski, Eroh, Northeast, and Lehigh Valley violated the FCA by avoiding repayment obligations. As I hold that the government has stated a claim with respect to the other FCA counts, I will similarly decline to dismiss count eight.

[16] Counts nine and ten, for payment by mistake of fact and unjust enrichment, are brought against Martinez, Chlebowski, Northeast, Lehigh Valley, Carolina, MM Consultants, and MCM Bethlehem. Count eleven, for common law fraud, is against all defendants.

on this payment." Harleysville Mut. Ins. Co. v. Cramsey, No. 2001-C-2972, 2003 Pa. Dist. &

Cnty. Dec. LEXIS 559, at *10 (Pa. C.P. Dec. 8, 2003) (Lehigh Cnty); see also United States v.

Albinson, No. 09-1791 (DRD), 2010 U.S. Dist. LEXIS 83644, at *53–54 (D.N.J. Aug. 16, 2010)

("Payment under mistake of fact and unjust enrichment are essentially duplicative and seek the

same relief.").  A party seeking to plead unjust enrichment must allege:

> (1) a benefit conferred on the defendant by the plaintiff; (2)
> appreciation of the benefit by the defendant; and (3) the
> defendant's acceptance and retention of the benefit under such
> circumstances that it would be inequitable for defendant to retain
> the benefit without payment of value.

Giordano v. Claudio, 714 F. Supp. 2d 508, 530 (E.D. Pa. 2010) (quoting Filippi v. City of Erie,

968 A.2d 239, 242 (Pa. Commw. 2009)); see also Primerica Life Ins. v. James Massengill &

Sons Constr. Co., 712 S.E.2d 670, 677 (N.C. App. 2011) (describing the same elements under

North Carolina law).

The government's allegations supporting this claim are the same as those supporting the

FCA claims, as are the defendants' arguments to dismiss.  I will therefore deny the defendants'

motion to dismiss.  See U.S. ex rel. Monahan v. Robert Wood Johnson Univ. Hosp., No. 02-

5702, 2009 U.S. Dist. LEXIS 38898, at *26–28 (D.N.J. May 6, 2009) (holding that claims for

payment by mistake of fact and unjust enrichment were adequately pled where allegations state a

claim for fraud under the FCA).

### 2.  **Common Law Fraud**

Where a party has pled FCA liability, it will also have pled common law fraud, except

that common law fraud also requires allegations of reliance or damages.  Escobar, 136 S. Ct. at

1999 ("[T]he term 'fraudulent' is a paradigmatic example of a statutory term that incorporates

the common-law meaning of fraud."); United States v. Albinson, No. 09-1791, 2010 U.S. Dist.

LEXIS 83644, at *51 (D.N.J. Aug. 16, 2010) ("The principal difference between a FCA cause of action and one for common law fraud is that the FCA does not require reliance or damages."); see also Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 296 (3d Cir. 1991) (requiring a plaintiff claiming fraud under Pennsylvania law to show justifiable reliance and damages); Forbis v. Neal, 649 S.E.2d 382, 387 (N.C. 2007). Because the government has alleged significant damages here, (see Gov't Compl. ¶¶ 2, 105 (alleging the clinics collected approximately $75 million in payments from Medicare and Medicaid from 2009 through 2012), it has stated a claim for common law fraud.

## F.  Piercing the Corporate Veil

MCM Bethlehem and MM Consultants argue that the government failed to state an FCA claim against them[17] because it does not allege that they submitted or caused to be submitted any claims to the government. (Clinic Defs.' Mot to Dismiss 18; Martinez Defs.' Mot. for J. on the Pleadings 16.) The government argues it has stated a claim against the companies by alleging conspiracy under the FCA, payment by mistake of fact/unjust enrichment, and facts showing that the common law remedy of piercing the corporate veil is appropriate here. (Gov't Opp'n to Martinez Defs.' Mot for J. on the Pleadings 10–14.)[18] I find that the government has alleged facts to support a claim to reverse-pierce the corporate veil against these defendants.

While veil-piercing involves accessing a corporate owner or shareholder's assets to enforce a judgment against the corporation, "reverse" veil-piercing involves using corporate

_____

[17] The government brings claims against MM Consultants and MCM Bethlehem in counts one, two, six, nine, ten, and eleven.

[18] In its first response, the government argued that it can recover against the company under the Federal Debt Collection Procedures Act (FDCPA)'s fraudulent transfer statute, 28 U.S.C. § 3306(a). (Gov't Opp'n to Mots. Dismiss 39–40.) The defendants pointed out in reply that the government never identified a claim under the FDCPA in its complaint. (Clinic Defs.' Reply in Support of Mot. to Dismiss 8.) The government thereafter put forth the arguments discussed here.

assets to satisfy a judgment against its owner.  In re Blatstein, 192 F.3d 88, 100 (3d Cir. 1999).

As with regular veil-piercing, reverse veil-piercing should only be employed in order to prevent

fraud, illegality, injustice, or a contravention of public policy.  Id.; Pearson v. Component Tech.

Corp., 247 F.3d 471, 484 (3d Cir. 2001).  In evaluating whether veil-piercing is appropriate, a

court should consider whether the company failed to observe corporate formalities, had

functioning officers and directors, or kept corporate records, and whether the owner and the

corporation comingled funds so that "the corporation is merely a facade for the operations of the

owner."  Pearson, 247 F.3d at 484–85; Blatstein, 192 F.3d at 101.  These factors are not

"elements of a rigid test"; rather, the key inquiry is "whether the debtor corporation is little more

than a legal fiction."  Pearson, 247 F.3d at 485; Schwartzman v. Stinson, 2012 U.S. Dist. LEXIS

156171, at *8–10 (E.D. Pa. Oct. 31, 2012) (applying reverse corporate veil-piercing where a

corporation's sole founder and owner used the corporation as a conduit for his personal assets).

    With respect to MM Consultants and MCM Bethlehem, the government has alleged facts

that, taken as true, sufficiently allege that reverse veil-piercing is appropriate.

### 1.  MM Consultants

    The government alleges that, in late 2007, Martinez formed MM Consultants as a

Pennsylvania limited liability company registered at Martinez and Chlebowski's home address.

(Gov't Compl. ¶ 39.)  Martinez controls MM Consultants and the income it generates.  (Id.)  MM

Consultants currently owns all or part of three different clinic sites; Northeast's "Baby" clinic,

(id. at ¶ 40); Lehigh Valley's North 7th Street clinic, (id. at ¶ 41); and Lehigh Valley's Bethlehem

clinic, (id. at ¶ 42.)  Martinez transferred the "Baby" clinic to MM Consultants in 2009.  (Id. ¶

40, Ex. M.)

    The government alleges MM Consultants is concealing Martinez's receipt of the clinics'

profits through rent payments and no-interest loans.  (Id. at ¶ 39.)  Northeast pays Martinez/MM

Consultants $7,000 each month as rent for its use.  (Id. at Ex. M.)  Lehigh Valley gave Martinez a $50,000 no-interest loan (via check made out to Chlebowski) to help pay for his half of the purchase price of the North 7th Street Property, which MM Consultants and Lehigh Valley bought together.  (Id. at ¶¶ 41, 187 187.)  Martinez then used the property as collateral to obtain a $600,000 loan.  (Id. at ¶ 187.)  Lehigh Valley leases the property from MM Consultants for $9,600 per month.  (Id. at ¶ 36.)  MM Consultants also purchased a parking lot across the street from another Lehigh Valley clinic, Bethlehem, and leases it to the corporation for $2,000 per month.  (Id. at ¶ 42.)

Additionally, the government alleges the clinics conferred profits to Martinez by making improvements on three different occasions to MM Consultants' properties at the clinics' expense (id. at ¶¶ 118, 191):  In 2012, Northeast paid $50,000 to expand the Baby clinic site (id. at ¶ 193); in 2012, Lehigh Valley paid $200,000 to renovate and expand the North 7th Street property, (id. ¶ 192); and the same year, Lehigh Valley paid $700,000 to renovate and expand MM Consultants' Bethlehem clinic site.  (Id. ¶ 193.)

### 2.  MCM Bethlehem

Chlebowski created MCM Bethlehem as a Pennsylvania limited liability corporation in September 2013, with a registered address at her and Martinez's home address.  (Id. ¶ 43.)  She "formed MCM Bethlehem after she became aware of the government's investigation of Martinez's involvement in the clinics" that preceded its intervention in this case.  (Id.)  Martinez then transferred the ownership of several clinic sites to MCM Bethlehem, including Lehigh Valley's Bethlehem clinic (id. ¶ 30), and Lehigh Valley's 4th Street clinic, (id. ¶ 44.)  MCM Bethlehem now rents the 4th Street clinic to Lehigh Valley for $8,000 per month.  (Id.)

These facts are sufficient to show that MM Consultants and MCM Bethlehem commingled assets with Martinez and Chlebowski and so acted as a facade for their operations. Therefore, I will not dismiss the claims against them.

## IV.    CONCLUSION

In light of the foregoing, defendants' motions to dismiss and for judgment on the pleadings are denied.

An appropriate Order follows.